# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 23, 2018　　　　　Decided June 19, 2018

No. 15-5294

WESTERN ORGANIZATION OF RESOURCE COUNCILS AND
FRIENDS OF THE EARTH,
APPELLANTS

v.

RYAN ZINKE, IN HIS CAPACITY AS SECRETARY OF THE
INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01993)

———

*Eric F. Citron* argued the cause for appellants. With him on the briefs were *Thomas C. Goldstein* and *Richard E. Ayres*. *Sarah E. Harrington* entered an appearance.

*Michael T. Gray*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, and *Eric Grant*, Deputy Assistant Attorney General.

*James Kaste*, Deputy Attorney General, Office of the Attorney General for the State of Wyoming, *Erik E. Petersen*, Supervisory Attorney General, and *Michael M. Robinson*,

Senior Assistant Attorney General, were on the joint brief of intervenors the State of Wyoming, et al. in support of appellees. *Margaret I. Olson*, Assistant Attorney General, Office of the Attorney General for the State of North Dakota, and *Andrew C. Emrich* entered appearances.

*James M. Auslander* and *Peter J. Schaumberg* were on the brief for *amicus curiae* National Mining Association in support of defendants-appellees and intervenors-appellees for affirmance of the District Court.

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The Mineral Leasing Act, 30 U.S.C. § 181 *et seq.* (2012), and the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.*, authorize the Secretary of the Department of the Interior ("Secretary" or "Department") to lease rights to mine coal on public lands. In 1979, acting through the Bureau of Land Management ("BLM"), the Secretary published a programmatic environmental impact statement ("PEIS") for a Federal Coal Management Program ("Program"). The PEIS was issued pursuant to the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C), and it reflected the Secretary's proposed approach for exercising his statutory authority. In July of that year, the Department issued a Record of Decision adopting the Program.

BLM then promulgated regulations establishing the Program's procedures. It amended those regulations in 1982, and last issued a supplement to the Program's PEIS in 1985.

In 2014, Appellants Western Organization of Resource Councils and Friends of the Earth brought suit in the District Court, seeking an order compelling the Secretary to update the Program's environmental impact statement. The District Court granted the Secretary's motion to dismiss. In so doing the court held that the Secretary had "no duty to supplement the 1979 programmatic EIS for the federal coal management program because there is no remaining or ongoing major federal action that confers upon them a duty to do so." *W. Org. of Res. Councils v. Jewell*, 124 F. Supp. 3d 7, 13 (D.D.C. 2015). Appellants timely appealed to this court.

Appellants claim that the Secretary's failure to supplement the Program's PEIS violates both NEPA and the Administrative Procedure Act ("APA"). Appellants note that when the Department issued amended regulations in 1982, "it reaffirmed that it retained an obligation under NEPA to revise or update the 1979 Program EIS when its assumptions, analyses and conclusions [were] no longer valid." Appellants' Br. 2. Appellants point out that, since 1979, "tens of thousands of peer-reviewed scientific studies have identified the causes and consequences of continued atmospheric warming and showed that coal combustion is the single greatest contributor to the growing concentration of greenhouse gases in the atmosphere." *Id.* at 3. Given that these studies were not available when the Secretary issued the 1979 PEIS or the 1985 supplement, Appellants contend that the Secretary is required to supplement its programmatic environmental analysis.

The federal action establishing the Federal Coal Management Program was completed in 1979. And the

Secretary has not proposed to take any new action respecting the Program. In these circumstances, neither NEPA nor the APA requires the Secretary to update the PEIS for the Federal Coal Management Program. We therefore lack authority to compel the Secretary to do so. Accordingly, the judgment of the District Court is affirmed.

## I.  BACKGROUND

## A.  Statutory and Regulatory Background

### 1.  The National Environmental Policy Act

NEPA requires all federal agencies to prepare and include an environmental impact statement ("EIS") in "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As part of this process, agencies must "take a 'hard look' at their proposed actions' environmental consequences in advance of deciding whether and how to proceed." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015). This ensures that agencies "consider every significant aspect of the environmental impact of a proposed action," and "inform the public" of their analysis. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

The Council on Environmental Quality ("CEQ"), established by NEPA, has authority to interpret the statute and has promulgated regulations to guide federal agencies in complying with its mandate. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). The CEQ regulations articulate two principles that govern the dispute in this case.

First, the regulations require an environmental analysis to account for the cumulative impacts of an action "when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (2017); *see also id.* § 1508.25(a)(2). One way agencies can satisfy this requirement is by "tiering" their analyses. Tiering allows an agency to meet its NEPA obligations in steps: First, the agency publishes a PEIS assessing the entire scope of a coordinated federal program. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 91 (D.C. Cir. 2006). The PEIS ensures that the agency assesses "the broad environmental consequences attendant upon a wide-ranging federal program." *Id.* at 92. The agency later supplements that programmatic analysis with narrower EISs analyzing the incremental impacts of each specific action taken as part of a program. *Id.* at 91.

Second, the CEQ regulations specify when agencies must update their environmental analyses in response to changed conditions. Specifically, agencies must prepare a supplemental impact statement when there exist "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (2017).

Thus, to meet its NEPA obligations, an agency must consider the cumulative impacts of a proposed action, *see id.* § 1508.25(a), and generally cannot rely on an outdated analysis to support its actions, *see id.* § 1502.9(c)(1)(ii).

2.    *The Federal Coal Management Program*

The Mineral Leasing Act empowers the Department to lease rights to coal on public lands. 30 U.S.C. § 181 *et seq.* Prior to 1973, the Department exercised this power in a "reactive" manner, processing lease applications on a "case-by-

case basis." Dep't of the Interior, BLM, Final Envtl. Statement, Fed. Coal Mgmt. Program, 1-9 (1979), [hereinafter "PEIS"], *reprinted at* J.A. 113, 142. The agency gave "little consideration" to "total coal reserves under lease or to the need for additional leasing, and environmental impacts . . . were not addressed." *Id.* But in the 1970s, the Secretary of the Interior decided that the better course would be to develop a comprehensive planning system for future coal leasing. *See id.* at 1-9–1-10, J.A. 142–43.

To achieve this goal, the Secretary undertook a number of administrative actions that eventually resulted in adoption of a Federal Coal Management Program. Initially, the Department commenced notice and comment rule making on "the procedures that the Secretary of the Interior will use to carry out his authority to manage Federal coal." Proposed Rulemaking, Coal Mgmt., 44 Fed. Reg. 16,800, 16,800 (March 19, 1979). The Secretary's "preferred program" allocated land for leasing based on analysis of national and regional coal demand. *See* PEIS at 3-2–3-3, J.A. 262–63. It included a planning system to decide which areas would be listed for coal production, a system for evaluating the national demand for coal, and procedures for conducting sales, issuing and enforcing leases, and complying with the agency's NEPA duties. *See id.*

In 1979, the agency issued a PEIS to support its proposal. *See* PEIS, J.A. 113. The PEIS analyzed the Secretary's preferred program, as well as several alternatives for a federal coal management plan. These included no new federal leasing; state determination of leasing levels; and emergency leasing only, among others. *See id.* at v, J.A. 120. The PEIS considered the physical, ecological, socioeconomic, transportation, and energy impacts of the various alternatives. As part of this analysis, the agency acknowledged that emissions resulting

from coal mining and combustion could lead to increased atmospheric carbon dioxide, and explained that "there are indications that the rising $CO_2$ levels in the atmosphere could pose a serious problem, commonly referred to as the greenhouse effect." *Id.* at 5-88, J.A. 486. It addressed carbon dioxide as a "potential pollutant," *id.*, and predicted increased levels of emissions from coal production under the proposed alternatives, *id.* at 5-107, J.A. 505. The agency ultimately stated that "there are uncertainties about the carbon cycle, the net sources of carbon dioxide in the atmosphere, and the net effects of carbon dioxide on temperature and climate," *id.* at 5-88, J.A. 486, and called for further study of the "impacts of increased coal utilization," *id.* at 5-107, J.A. 505.

In July 1979, the Department officially adopted the Federal Coal Management Program. It published a two-part document approving the Secretary's preferred program and discussing its rationale. *See* Department of the Interior, Secretarial Issue Document, Fed. Coal Mgmt. Program [hereinafter "ROD"], *reprinted at* J.A. 1391. This document served as the Record of Decision for the Program.

The Secretary additionally promulgated a final rule setting forth the Program procedures. Coal Mgmt.; Federally Owned Coal, 44 Fed. Reg. 42,584 (July 19, 1979). The 1979 rule detailed the steps that BLM would take to implement the Program, and it also set forth the circumstances in which the PEIS was to be updated. *Id.* at 42,616–20. The rule specified that the Department would supplement its environmental analysis if the Secretary determined that regional production goals and leasing targets "vary significantly from those analyzed," or that the available tracts may "generate significantly different levels or types of environmental impacts than were anticipated" in the most current PEIS. *Id.* (previously codified at 43 C.F.R. § 3420.3–4).

In 1982, the Secretary issued another rule purporting to "eliminate burdensome, outdated . . . provisions of the existing coal management regulations." Amendments to Coal Mgmt. Program Regulations, 47 Fed. Reg. 33,114, 33,114 (July 30, 1982). Because the rule redefined the goal for how leasing targets should be set, a number of commenters argued that the proposed rule constituted a "new program" and thus required its own EIS. *See id.* The Secretary responded that an environmental assessment had been performed and it had been determined that no new EIS was required. *See id.* at 33,115.

The 1982 rule removed the provision that had been included in the 1979 rule addressing the procedures for updating or revising the PEIS. *See id.* In response to comments suggesting that the deletion would demonstrate a lack of commitment to protecting the environment, the Secretary explained that, "[r]egardless of whether this provision [was] deleted or retained, the Department must revise or update the Program EIS when its assumptions, analyses and conclusions are no longer valid." *Id.* The Secretary explained further that, because "[t]he exact procedures necessary for compliance with [NEPA] at some future time are . . . difficult to predict," the Department decided to delete the provision despite "recognizing that its obligations under [NEPA] remain unchanged." *Id*.

In 1985, the Secretary published a supplemental PEIS for the Program. Fed. Coal Mgmt. Program, Final EIS Supplement (October 1985), *reprinted at* J.A. 1400. The supplemental PEIS claimed to "assess[] the environmental consequences of continuing the federal coal management program as modified [since the original PEIS]." *Id.*, J.A. 1404. The Secretary stated that supplementation was necessary because "[i]n the 6 years since the 1979 [PEIS] was published . . . economic and

environmental conditions have changed." *Id.* at 3, J.A. 1409. The supplemental PEIS predicted that continued coal leasing would have no long-term impacts on air quality. *See id.* at 319, J.A. 1436.

Although the Federal Coal Management Program has been modified in various ways over the years, the 1979 regulations and ROD largely remain in effect. Through the BLM, the Secretary continues to run the Program and make leasing and general programmatic management decisions – including how many, where, and to whom leases should be granted.

In administering the Program, the Department continues to engage in NEPA-required environmental analysis. Each lease issued under the Program represents a new "federal action." The Department prepares a specific EIS or environmental assessment for each lease before it is approved. *See* 43 C.F.R. § 3425.3 (2017). These project-specific EISs assess greenhouse gas emissions related to specific leases; however, they do not purport to consider the general climate effects of the national leasing Program as a whole. *See* CEQ, Final Guidance for Fed. Dep'ts & Agencies on Consideration of Greenhouse Gas Emissions & the Effects of Climate Change in NEPA Reviews, 81 Fed. Reg. 51,866, 51,866–67 (Aug. 1, 2016), *available at* https://www.gpo.gov/fdsys/pkg/FR-2016-08-05/pdf/2016-18620.pdf; *see also WildEarth Guardians v. Jewell*, 738 F.3d 298, 309 (D.C. Cir. 2013).

**B. Procedural History**

Appellants Western Organization of Resource Councils and Friends of the Earth are nonprofit organizations whose members are concerned about the environmental and climate-related impacts of coal production and combustion. In 2014, Appellants sued the Secretary and other Department officials,

claiming that the Department's failure to update the Federal Coal Management Program's PEIS violates NEPA and the APA. The States of Wyoming and North Dakota and the Wyoming Mining Association intervened as defendants.

The Secretary and other defendants before the District Court filed a motion to dismiss. The District Court granted the motion on August 27, 2015. *W. Org. of Res. Councils*, 124 F. Supp. 3d 7. The District Court held that, because the Program was established and the Department had not proposed to take any new action respecting the Program, the Department had no obligation to prepare a new or supplemental PEIS. *See id.* at 12–13. Appellants then filed a timely appeal in this court.

While this appeal was pending, then-Secretary of the Department of the Interior, Sally Jewell, issued an order pausing all activity on new leases to permit the agency to revisit the PEIS. Sec'y of the Interior, Order No. 3338 (Jan. 15, 2016), *reprinted at* J.A. 1438. The order explained that "[n]umerous scientific studies indicate that reducing [greenhouse gas] emissions from coal use worldwide is critical to addressing climate change." *Id.* at 4, J.A. 1441. Secretary Jewell therefore concluded that, in light of the "lack of any recent analysis of the Federal coal program as a whole, a more comprehensive, programmatic review [wa]s in order." *Id.* at 6, J.A. 1443. On the parties' joint motion, this court held the case in abeyance.

On March 29, 2017, newly appointed Secretary Zinke ordered an immediate halt to "[a]ll activities associated with the preparation of the [new] PEIS" and lifted the moratorium on new leasing. *See* Sec'y of the Interior, Order No. 3348 (Mar. 29, 2017), *reprinted at* J.A. 1476–77. The court then granted Appellants' motion to rescind the order holding the case in abeyance and to set a briefing schedule.

## II.  ANALYSIS

### A.  Standard of Review

This court reviews *de novo* a district court decision granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011). When reviewing the grant of a motion to dismiss, the court "must treat the complaint's factual allegations as true, and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations and internal quotation marks omitted).

### B.  The Merits of Appellants' Claim

Appellants claim that NEPA requires the Secretary to issue a supplemental PEIS analyzing the climate impacts of federal coal leasing. Because NEPA does not provide a cause of action, we review the Secretary's compliance with its statutory mandate under the APA. *See Tulare Cty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002).

Appellants' cause of action in this case rests solely on § 706(1) of the APA, which states that a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Appellants contend that NEPA requires the Secretary to supplement the 1979 PEIS for the Federal Coal Management Program, and that the Department's failure to do so constitutes "agency action unlawfully withheld." *Id*. Appellants ask this court to compel the Secretary to comply with the statute as relief for the Department's "failure to act."

The seminal case on § 706(1) actions is *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55 (2004). *SUWA* teaches that the only action a court may compel an agency to take under § 706(1) is discrete action that the agency has a duty to perform. 542 U.S. at 62–63. The legal duty must be "ministerial or nondiscretionary" and must amount to "a specific, unequivocal command." *Id.* at 63–64. Appellants point to two sources that they claim require the Secretary to update the PEIS – (1) the supplementation requirement in the CEQ regulations; and (2) statements included by the Secretary in the initial PEIS and ROD promising to update the environmental analysis as circumstances changed. Because neither source requires the Secretary to update the PEIS for the Federal Coal Management Program, Appellants' claim fails.

### 1. NEPA and the CEQ Regulations

In challenging the Secretary's failure to act, Appellants first point to the requirement in the CEQ regulations that agencies supplement their environmental impact statements to take account of "significant new . . . information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). They claim that progress in climate science has produced such new information.

Appellants also rely heavily on the Supreme Court's decision in *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989). They contend that:

[T]he Supreme Court explained in *Marsh* [that] NEPA's duty to supplement an EIS applies when "remaining governmental action would be environmentally 'significant,'" the agency retains an "opportunity to weigh the benefits of the project versus the detrimental effects on the environment," and "new

information is sufficient to show that the remaining action will 'affect the quality of the human environment' . . . to a significant extent not already considered." Interior's continuing management of the coal-leasing program easily brings this case within that test because—among other things—we now know that continued authorization of leases to extract (and then burn) federal coal is "affect[ing] the quality of the human environment . . . to a significant extent not already considered." The climate-change implications of that ongoing action are substantial and should now be informed by 38 years of research that Interior expressly called for in its 1979 PEIS, but has never considered in a supplemental programmatic analysis. *Marsh* forbids this result, as does the plain text of the governing regulation . . . .

Appellants' Br. 30–31 (quoting *Marsh*, 490 U.S. at 371–74) (emphases removed).

The Secretary does not contest Appellants' assertion that the analyses of climate impacts of coal leasing in the PEIS and supplemental PEIS are outdated. Nor does the Secretary dispute Appellants' claims that the availability of meaningful scientific research measuring greenhouse gas emissions and their climate impacts qualify as "significant new . . . information bearing on" federal coal leasing and its impacts. Instead, the Secretary asserts that the Department no longer has any NEPA obligations related to the Federal Coal Management Program. On this point, the Secretary contends that, because "BLM is not proposing to take any new action in reliance on the 1979 [P]EIS, . . . [the supplementation] regulation simply does not apply." Sec'y's Br. 19. And the Secretary contends that *Marsh* is inapposite because "[t]he Court in *Marsh* never

considered any programmatic EIS, let alone the question whether a programmatic EIS must be supplemented." *Id*. at 22.

The Court's decision in *Marsh* is a good starting point for our analysis. At issue in *Marsh* was the construction of a dam by the Army Corps of Engineers in the Rogue River Basin in southwest Oregon. Environmental groups sued to enjoin construction of the dam, arguing that NEPA required the Corps to issue a second EIS considering new information developed after it published its initial statement. At the time the law suit was filed, the dam had been approved, but construction was far from complete. *See Marsh*, 490 U.S. at 363–70.

The *Marsh* Court confirmed that preparation of "postdecision supplemental environmental impact statements . . . is at times necessary to satisfy the Act's 'action-forcing' purpose" and explained when that is the case. *Id.* at 370–71. The Court indicated that, "although it would make sense to hold NEPA inapplicable at some point in the life of a project," the law requires that agencies "file environmental impact statements when the remaining governmental action would be environmentally 'significant.'" *Id.* at 371–72 (some internal quotation marks omitted). The Court clarified that this duty to supplement requires agencies to "take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval" when (1) "there remains 'major Federal action' to occur," and (2) "the new information is sufficient to show that the remaining action will 'affect the quality of the human environment' in a significant manner or to a significant extent not already considered." *Id.* at 374. The Court concluded that the construction work that remained to be completed on the dam satisfied the first part of this test, but it deferred to the Corps' determination that the newly identified information was insufficient to merit a new EIS. *See id.* at 385.

Although the decision in *Marsh* lends some support for Appellants' position in this case, the Court's subsequent decision in *SUWA* does not. In *SUWA*, environmental groups sought to compel BLM to supplement an EIS it had issued in advance of approving a federal land-use plan. 542 U.S. at 60–61. The groups argued that NEPA required BLM to take account of increased use of off-road vehicles in certain parts of the managed land. *Id.* Rejecting this argument, the Court concluded that NEPA imposed no such requirement. Although it recognized that a supplemental EIS is sometimes necessary, the Court held that "*approval* of a land use plan" was the "major Federal action" triggering NEPA's EIS requirement, and that "action [wa]s completed when the plan [wa]s approved." *Id.* at 72–73. Because there were no proposed amendments or revisions to the plan, there remained "no ongoing 'major Federal action' that could require supplementation'" under the first prong of the *Marsh* test. *Id.* at 73.

The *SUWA* Court reconciled its decision with *Marsh*. In *Marsh*, the Court explained, the dam's *construction* was the "major Federal action" triggering NEPA, so there remained "action" to occur because construction was incomplete. *Id.* By contrast, in *SUWA*, the *approval* of the land management plan was the relevant "major Federal action." *Id.* The action thus terminated with the plan's approval, and there was no duty to supplement the EIS after that point. It did not matter that the plan continued to govern actions that took place after the approval. *See id.*

These cases make clear that the supplementation inquiry turns on how the "propos[ed] . . . Federal action" is defined. 42 U.S.C. § 4332(2)(C). The Secretary argues that the relevant actions here were the 1979 and 1982 final rules, and that they – like the plan in *SUWA* – were completed when promulgated.

Appellants, in turn, argue that the action should be viewed as encompassing the Program broadly, including the leases and orders that the Department issues on an ongoing basis. On this view, there remains sufficient activity to occur as part of the Program to require supplementation.

We agree with the Secretary that *SUWA* controls the disposition of this case. The Program here is functionally identical to the plan the Court evaluated in *SUWA*. In both cases, the agency established an approach for managing resources in the future. Under both the *SUWA* plan and the Federal Coal Management Program that is at issue in this case, the agency continued to engage in activities governed by the overarching scheme for which the initial EIS was prepared. As *SUWA* makes clear, the fact that actions continue to occur in compliance with the Program does not render the original action incomplete. Accordingly, the Department's NEPA obligation for the Federal Coal Management Program terminated with its adoption in 1979.

Appellants argue that because the Program is properly viewed as ongoing, it was not complete when approved. They point out that "environmentally significant decisions plainly remained" to be made in carrying out the Program, including in pricing future leases, allocating new leases, and issuing guidance and manuals. Appellants' Br. 34–35. Because "[t]hese responsibilities . . . lead directly to the mining and burning of federal coal," Appellants argue, the "myriad 'environmentally significant' steps the agency continues to take" demonstrate that there remains ongoing "major Federal action" under the Program. *Id.* at 36.

This argument cannot be squared with the governing precedent. Neither *Marsh* nor *SUWA* looked to decisions made pursuant to the relevant action in determining whether the duty

to supplement applied. They looked instead to the status of the action itself. Appellants have failed to identify any specific pending action, apart from the Program's continued existence, that qualifies as a "major Federal action" under NEPA. So the only pertinent action for purposes of the court's analysis is the one for which that document was prepared – the adoption of the Federal Coal Management Program. That action was completed when the Secretary issued the ROD and promulgated the final rule in 1979.

Appellants urge us to read *SUWA* narrowly, claiming that its holding applies only where, as there, a regulation specifically indicates that the approval of a plan is the relevant action for NEPA purposes. *See* 542 U.S. at 73 (citing 43 C.F.R. § 1601.0–6). They claim that because there is no similar regulation here, *SUWA* does not control. Appellant's view of the record is mistaken. The Secretary's 1979 Final Rule referred to "the *adoption* of the Federal coal management program on June 1 and 2, 1979" as "a major Federal action significantly affecting the quality of the human environment" for which the 1979 EIS was published. 44 Fed. Reg. at 42,608 (emphasis added). And the PEIS identified the proposed action as "the *adoption* of the . . . Federal coal management program." PEIS at iv, J.A. 119 (emphasis added). Appellants provide no persuasive reason to treat the agency's definition of the action here differently than the regulation in *SUWA*.

Appellants also assert that by deeming the Program's adoption to be the relevant "major Federal action," we foreclose any challenge to the agency's failure to consider the cumulative climate impacts of federal coal leasing. They argue that doing so allows the Department to avoid its duty to study the impacts of its actions and justify its decision to the public. In Appellants' view, this outcome "render[s] NEPA review [a] 'paperwork' formality," Appellants' Br. 34, and allows the

Department to "hide the ball indefinitely, leaving the public to guess at both the environmental costs of one of the Nation's predominant sources of carbon pollution and the agency's views on what many voting citizens believe to be the defining environmental-protection issue of our time," *id.* at 69.

We understand that Appellants' claims are not frivolous. As noted above, Appellants have pointed to significant scientific studies that have identified the causes and consequences of continued atmospheric warming and showed that coal combustion is the single greatest contributor to the growing concentration of greenhouse gases in the atmosphere. Given that these studies were not available when the Secretary issued the 1979 PEIS and the 1985 supplement, Appellants raise a compelling argument that the Secretary should now revisit the issue and adopt a new program or supplement its PEIS analysis.

Appellants have several avenues to raise their claims regarding the climate-change implications of coal leasing. First, as the Department points out in its brief, *see* Sec'y's Br. 17, Appellants may petition the Secretary for a rule making, seeking to have the coal management regulations take into account the serious environmental impacts of any coal leasing program. If the Secretary denies the petition for rule making, Appellants may seek judicial review of that determination. *See Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007).

Second, Appellants may, when appropriate, challenge specific licensing decisions on the ground that the EIS prepared in support of any such decision fails to satisfy NEPA's mandate to consider the cumulative environmental impacts of coal leasing. Such a claim might challenge any attempt by BLM to rely on (or tier to) the 1979 PEIS on the ground that it is too outdated to support new federal action. *See* 40 C.F.R.

§ 1508.28; *id.* § 1502.9(c)(1)(ii). NEPA compels the Department to include a complete environmental analysis in its proposal for any new major Federal action – even actions taken pursuant to the Federal Coal Management Program. *See SUWA*, 542 U.S. at 73. Indeed, the Secretary admits that any deficiencies in the PEIS "may affect the ability of BLM to 'tier' to that document when making individual leasing decisions." Sec'y's Br. 24. Our decision in *WildEarth Guardians v. Jewell,* 738 F.3d 298 (D.C. Cir. 2013), is not to the contrary. In that case, the court rejected a challenge to the sufficiency of the climate impacts analysis provided in the EIS for a specific licensing decision. *Id.* at 308–11. But the appellants in that case did not argue that tiering to the PEIS was inadequate because the PEIS had not been supplemented, and the court did not address that issue. *See id.*

Our holding in this case is also limited to the record before us. We are bound by established law holding that NEPA requires an agency to update its EIS only when it has proposed major federal action that is not yet complete. As explained above, the adoption of the Federal Coal Management Program was the relevant action in this case, and it was completed in 1979. Therefore, no "major Federal action" remains as part of that action, and NEPA does not provide a legal duty to supplement the PEIS.

2. *The Department's Alleged Prior Statements that It Was Obliged Under NEPA to Revise or Update the 1979 PEIS*

In further support of their claims in this case, Appellants rely on statements that the Secretary included in the original regulatory materials for the Program. In the PEIS, the Department stated that the first level of environmental "analysis would be contained in this [PEIS], *updated when*

*necessary*." PEIS at 3-68, J.A. 328 (emphasis added). And in both the PEIS and ROD, the Department stated that "[n]ational and interregional impacts of the Federal coal management program are analyzed in [the PEIS, which] *would be updated when conditions change* sufficiently to require new analyses of those impacts." *Id.* at 3-9, J.A. 269; ROD at 98, J.A. 1399 (emphasis added). Appellants contend that these statements committed the agency to update the PEIS, even if NEPA does not require it.

These cited statements might have created a binding duty on the agency at one point. *See* 40 C.F.R. § 1505.3 (stating that "conditions established in the [EIS] or during its review and committed as part of the decision shall be implemented"); *Tyler v. Cisneros*, 136 F.3d 603, 608 (9th Cir. 1998) (citing 40 C.F.R. § 1505.3 for the proposition that, where an agency commits to a measure in its EIS, the agency is required to implement the measure). In 1982, however, as part of its final rule amending the coal leasing regulations, the Department removed the provision explaining the circumstances in which the PEIS should be updated. *See* 47 Fed. Reg. at 33,115. In doing so, the Department made clear that it did not intend to bind itself to any supplementation duty beyond that imposed by NEPA.

To be sure, the agency indicated in its discussion of the revision that, at the time, it believed NEPA required periodic updates to the PEIS apart from any new proposed action. *See id.* (stating the Department's view that "[r]egardless of whether th[e] provision [was] deleted or retained, the Department must revise or update the Program EIS when its assumptions, analyses and conclusions are no longer valid"). But intervening case law indicates that NEPA imposes no such requirement. *See SUWA*, 543 U.S. at 72–73.

### III.   CONCLUSION

On the record before us, neither NEPA nor the Department's own documents create a legal duty for the Secretary to update the Federal Coal Management Program's PEIS. Therefore, this court has no authority to compel the Department to supplement its analysis. The decision of the District Court is hereby affirmed.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in part and concurring in the judgment: I concur in all but a small portion of the opinion. I write separately to express where and why I separate myself. I also explain why, in my view, the majority correctly does not reach the issue addressed by Judge Edwards in his concurrence.

First, I do not join the portion of the opinion that identifies alternative avenues by which the plaintiffs might press their claim. *See* Maj. Op. 18–19. Although I do not necessarily disagree with my colleagues' reflections, I think it is neither necessary nor appropriate to advise parties on potential avenues of relief not before us. *See, e.g.*, *Republic of Venezuela v. Phillip Morris Inc.*, 287 F.3d 192, 199–200 (D.C. Cir. 2002) (court should not "declare, for the government of future cases, principles . . . which cannot affect the result as to the thing in issue in the case before it" (quoting *California v. San Pablo & Tulare R.R. Co.*, 149 U.S. 308, 314 (1893))). I would leave it up to a future court to decide whether the alternatives discussed are sufficient to pursue the claim we reject in this appeal.

Second, I briefly explain why, in my view, the majority properly declines to address the Government's argument that the failure to prepare a supplemental Environmental Impact Statement (EIS) is not "final agency action" under section 704 of the Administrative Procedure Act (APA). Although my colleague believes we should address the "very important issue" raised by the Government, Concurring Op. 1, I think we should "confine ourselves to deciding only what is necessary to the disposition of the immediate case," *Whitehouse v. Ill. Cent. R.R. Co.*, 349 U.S. 366, 373 (1955). In *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55 (2004), the United States Supreme Court approached the same two issues we face here: whether the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, imposed a duty to supplement an EIS and whether the agency's failure to do so was actionable under the APA. 542 U.S. at 72–73. It set forth

the order of operations in mandatory terms: "Before addressing whether a NEPA-required duty is actionable under the APA, we *must* decide whether NEPA creates an obligation in the first place." *Id.* at 72 (emphasis added). After holding that NEPA did not require a supplemental EIS, the Supreme Court went no further; it did not decide whether the claim was actionable under the APA. *Id.* at 72–73. In deciding this appeal, the majority follows the Supreme Court's—rather than the Government's—roadmap. *Cf. Yousuf v. Samantar*, 451 F.3d 248, 255 (D.C. Cir. 2006) (stating general proposition that "we follow the guidance of the Supreme Court"); *Broudy v. Mather*, 460 F.3d 106, 118 (D.C. Cir. 2006) (noting that parties' "briefs [do not] follow the approach of the Supreme Court . . . to specifically identify claims as 'backward-looking' or 'forward-looking'" and identifying claims based on Supreme Court precedent). We first address whether NEPA required a supplemental EIS. Answering that question in the negative, we need not and do not proceed further—an outcome I believe proper under *SUWA* and judicial restraint principles.

EDWARDS, *Senior Circuit Judge*, concurring: In opposing Appellants' claim in this case, the Department pressed two arguments: (1) Declining to prepare a supplemental EIS is not, by itself, a "failure to act" that qualifies as reviewable "final agency action" under § 704 of the APA; and (2) The NEPA regulations do not require the Department to supplement its PEIS in this case. Because we agree with the Department on the second point, the majority has declined to address the first point. I write separately to address the first point. Why? Because the Department's argument raises a very important issue regarding the scope of § 706(1) of the APA, and, in my view, the Department's argument regarding the reach of § 704 is both wrong and mischievous.

Appellants' cause of action in this case rests solely on § 706(1) of the APA, which states that a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Appellants contend that NEPA requires the Secretary to supplement the 1979 PEIS for the Federal Coal Management Program, and that the Department's failure to do so constitutes "agency action unlawfully withheld." *Id.* Appellants ask this court to compel the Secretary to comply with the statute as relief for the Department's "failure to act."

As noted in the opinion for the court, the seminal case on § 706(1) actions is *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55 (2004). The District Court correctly explained that "[a] claim under the 'unlawfully withheld' provision of § 706(1) can proceed only if it contends that the 'agency failed to take a discrete agency action that it is required to take.'" *W. Org. of Res. Councils v. Jewell*, 124 F. Supp. 3d 7, 10 (D.D.C. 2015) (quoting *SUWA*, 542 U.S. at 64). In *SUWA*, the Court also explained how § 706(1) fits into the APA review framework:

The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Where no other statute provides a private right of action, the "agency action" complained of must be "*final* agency action." § 704 (emphasis added). "[A]gency action" is defined in § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*." (Emphasis added.) The APA provides relief for a[n] [agency's] failure to act in § 706(1): "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."

*SUWA*, 542 U.S. at 61–62.

*SUWA*'s reference to "final agency action" under 5 U.S.C. § 704 is perplexing insofar as it may pertain to actions under § 706(1) for "failure to act." There is a well-recognized two-part test to determine whether an action is a "final agency action" under § 704. "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* Obviously, this test does not easily accommodate an agency's *failure to act*. If an agency has failed to act with respect to a matter that a complaining party seeks to compel under § 706(1), it is hard to comprehend the contested *in*action as "final action" as that term is defined in *Bennett v. Spear*. And, yet, the Court's decision in *SUWA* leaves no doubt that an agency's failure to act may be challenged under § 706(1) if the

action is discrete and one that the agency is required to take. *See* 542 U.S. at 64.

The lower courts have remained a bit at sea over how to interpret the words in *SUWA* referring to § 704 and § 706(1). Judge Ebel's discussion of this issue in the Tenth Circuit case leading to the Supreme Court's decision in *SUWA* is illuminating:

> Courts have implicitly recognized that unlawfully withheld actions are considered final under § 704. Some emphasize, for example, that an agency must carry out nondiscretionary duties required by law, without discussing whether the withheld duty would be considered a final agency action. Courts have sometimes described § 706(1) as an exception to the APA "finality" requirement. This description may be slightly inaccurate, however, for § 704 of the APA defines the type of agency actions subject to judicial review and, in relevant part, limits judicial review to final agency actions. 5 U.S.C. § 704. Section 706(1), by contrast, defines the "scope" of judicial review over reviewable agency actions. *Id.* § 706.

*S. Utah Wilderness All. v. Norton*, 301 F.3d 1217, 1229 n.9 (10th Cir. 2002) (citations omitted), *rev'd*, 542 U.S. 55 (2004). The Supreme Court's decision in *SUWA* does not directly address the concerns raised by Judge Ebel. Nevertheless, the case law remains clear that a party may pursue a claim under 5 U.S.C. § 706(1) without satisfying the test of *Bennett v. Spear*. *See, e.g.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19–20, 19 n.10 (2013) (noting, without discussion of *Bennett v. Spear*'s final agency action requirement, that a litigant "would be free to seek a writ of mandamus" under § 706(1)); *Pub. Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d

21, 32 (D.C. Cir. 1984) (holding that "the court can undertake review [under § 706(1)] as though the agency had denied the requested relief and can order an agency to either act or provide a reasoned explanation for its failure to act").

*SUWA* says that "§ 706(1) empowers a court . . . to compel an agency to perform a ministerial or non-discretionary act, *or* to take action upon a matter, without directing [how] it shall act." 542 U.S. at 64 (emphasis added). There is no doubt that *SUWA* means to endorse "failure to act" claims under § 706(1) so long as a complaining party has sufficiently alleged "that an agency failed to take a *discrete* agency action that it is *required to take*." *Id*. And "legally required" "discrete" actions that have not been performed, as in the context of a § 706(1) claim, cannot satisfy the finality requirements of *Bennett v. Spear*. In opposing Appellants' action in this case, the Secretary seems not to understand this point.

The Secretary argues that "the decision not to prepare a supplemental EIS is not a 'final agency action' as that term is defined in section 704 and is therefore not by itself subject to direct judicial review." Sec'y's Br. 13. However, this is irrelevant to any assessment of the viability of a claim under § 706(1). The Secretary also contends that "[a] completed EIS is . . . not, by itself, final agency action that is subject to review, so the failure to complete one is not a 'failure to act' that may be independently reviewed under the APA in the absence of some challenge to a substantive final agency action for which an EIS or supplemental EIS should have been prepared." *Id.* at 14–15 (emphasis removed). This argument finds no support in the language of § 706(1) and it completely distorts the Court's holding in *SUWA*.

In an apparent effort to overcome the obvious frailties in its argument, the Department makes much of the fact that an EIS

is merely "a *procedural* prerequisite to a decision by the agency to undertake a 'major Federal action.'" *Id*. at 15 (emphasis added). According to the Secretary, "[a]s a procedural prerequisite to some other final agency action, an EIS is not directly reviewable under the APA, but is subject to review on the review of the final agency action." *Id*. at 16.

The fact that the preparation of an EIS may be a "procedural" matter is irrelevant to whether Appellants have raised a viable claim under § 706(1). The Secretary seems not to comprehend that "procedural rights" claims may be viable without regard to whether they result in any enforceable substantive rights.

The Supreme Court's discussion of standing to vindicate "procedural rights" reinforces this point. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Court offered the following example:

> [U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id*. at 572 n.7. *Lujan* did not address the scope of § 706(1) review, but the Court's discussion is instructive. As that decision suggests, the right to challenge an agency's failure to act in preparing an EIS is not diminished by the fact that such a suit protects merely a plaintiff's "procedural right" to have the EIS issued, rather than any "substantive right" regarding the action the agency will ultimately take.

In any event, I find no merit in the Secretary's attempt to limit the scope of judicial review under § 706(1). In assessing claims under § 706(1) – even in cases in which the claimants have lost – this court has never followed the approach the Secretary suggests in this case. *See, e.g.*, *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670–72 (D.C. Cir. 2016) (analyzing the scope of § 706(1) without regard to the test of "final agency action" under § 704); *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 890 (D.C. Cir. 2014) (explaining that claims under § 706(1) are viable when the allegedly withheld action is (1) "legally required" and (2) "discrete"). Our decision in *Public Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916 (D.C. Cir. 1992), on which the Secretary purports to rely, is inapposite because it says nothing about the scope of § 706(1).

The Secretary's position is flawed because it conflates the question regarding the scope of § 706(1) with the question relating to the merits of Appellants' "failure to act" claim. The Secretary's line of reasoning finds no support in *SUWA* or in other decisions that have addressed the scope of § 706(1).