# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 10, 2022      Decided August 30, 2022

No. 20-5179

GULF RESTORATION NETWORK, ET AL.,
APPELLANTS

v.

DEBRA A. HAALAND, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01674)

———

*Brettny E. Hardy* argued the cause for appellants. With her on the briefs were *Stephen D. Mashuda* and *Christopher D. Eaton*.

*Justin D. Heminger*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Todd Kim*, Assistant Attorney General, and *James A. Maysonett*, Attorney.

*Steven J. Rosenbaum*, *Bradley K. Ervin*, *John C. Martin*, *Susan Mathiascheck*, *Charles J. Engel, III*, and *Nikesh Jindal*

were on the brief for appellees American Petroleum Institute and Chevron, U.S.A., Inc.

Before: WILKINS, KATSAS, and JACKSON,[*] *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:  The Department of the Interior sells offshore leases to oil and gas companies for development. This case concerns the adequacy of an environmental impact statement prepared in connection with two lease sales held in 2018.  We hold that Interior adequately considered the option of not leasing, reasonably refused to consider potential future regulatory changes, and unreasonably refused to consider possible deficiencies in environmental enforcement.  Given the one shortcoming we have identified, we remand without vacatur.

I

A

The Outer Continental Shelf Lands Act (OCSLA) sets forth a procedural framework for oil and gas development in the Outer Continental Shelf, an area "between the outer seaward reaches of a state's jurisdiction and that of the United States."  *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).  In enacting the OCSLA, Congress declared that the Shelf "should be made available for expeditious and orderly development, subject to environmental safeguards."  43 U.S.C. § 1332(3).

---

[*] Circuit Judge, now Justice, Jackson was a member of the panel at the time the case was argued but did not participate in the opinion.

The OCSLA establishes a four-stage process for development. First, Interior evaluates national energy needs to formulate a five-year plan of proposed lease sales. 43 U.S.C. § 1344(a). Next, Interior sells the leases to the highest responsible qualified bidders. *Id.* § 1337(a)(1). But a lease does not confer "an immediate or absolute right to explore for, develop, or produce oil or gas on the OCS; those activities require separate, subsequent federal authorization." *Sec'y of the Interior v. California*, 464 U.S. 312, 317 (1984). That comes at the third and fourth stages, when Interior reviews lessees' plans for exploration and then for development and production. 43 U.S.C. §§ 1340, 1351. During this process, Interior must prepare environmental impact statements (EISs) as necessary. *See id.* § 1344(b)(3).

B

The National Environmental Policy Act governs the preparation of EISs. NEPA establishes procedural requirements to ensure that the government gives "appropriate consideration" to environmental impacts before undertaking major actions. 42 U.S.C. § 4332(2)(B)–(C). It requires the government to "take a 'hard look' at the reasonably foreseeable impacts of a proposed major federal action." *Indian River Cnty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 533 (D.C. Cir. 2019) (cleaned up). NEPA also tasks the Council on Environmental Quality with promulgating implementing regulations. 42 U.S.C. § 4332(2)(B); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). The statute requires that EISs consider "alternatives to the proposed action," 42 U.S.C. § 4332(2)(C)(iii), and a CEQ regulation clarifies that one such alternative must be the possibility of taking no action, 40 C.F.R. § 1502.14(c).

An agency can "meet its NEPA obligations in steps." *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1237 (D.C. Cir. 2018). When "tiering" its EISs, the agency first publishes a programmatic EIS to assess "the broad environmental consequences attendant upon a wide-ranging federal program." *Id.* (cleaned up). It later issues "narrower EISs analyzing the incremental impacts of each specific action taken as part of a program." *Id.* at 1238. Supplements are required when the agency "makes substantial changes" to its program or "[t]here are significant new circumstances or information … bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1).

C

This appeal concerns Lease Sales 250 and 251, which were among the 11 that Interior proposed in its five-year plan covering mid-2017 to mid-2022. Interior held the sales in 2018. They involve more than 150 million acres in the Gulf of Mexico.

Before the sales, Interior prepared three EISs. First, it issued a programmatic EIS addressing the environmental impacts of the five-year plan. Second, it issued a narrower "multisale" EIS addressing the impacts of leasing in the Gulf. Third, it issued a supplemental EIS specific to the two lease sales at issue.

After the sales, three environmental groups asserted that the supplemental EIS did not comply with NEPA. They sued Interior and the Bureau of Ocean Energy Management (BOEM), the component agency within Interior that had prepared the EISs. They argued that BOEM failed to assess a true "no action" alternative because it had assumed that energy development would occur sooner or later, even if Lease Sales 250 or 251 did not. They also argued that BOEM had unreasonably assumed two rules for protecting the

environment would remain in effect, despite the possibility of future modifications. Finally, they argued that BOEM had unreasonably assumed all such rules would be effectively enforced, despite a report suggesting otherwise. The American Petroleum Institute and Chevron U.S.A. Inc. intervened in support of Interior.

The district court granted summary judgment to Interior. In upholding BOEM's "no action" analysis, it found the Bureau had reasonably assumed that development was inevitable. *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 97–99 (D.D.C. 2020). The court concluded that BOEM did not need to consider whether the existing rules would change. *Id.* at 100. And it accepted BOEM's assumption that Interior would adequately enforce its rules. *Id.* at 100–02. The environmental groups now appeal.

II

Courts review agency compliance with NEPA through the Administrative Procedure Act. *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017). The district court thus sat as an appellate tribunal, reviewing BOEM's decision under the familiar APA standards. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). We, in turn, apply the same standards. *Rempfer v. Sharfstein*, 583 F.3d 860, 864–65 (D.C. Cir. 2009).

Under the APA, we ask whether agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This review is "highly deferential" to the agency. *Defs. of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (cleaned up). In particular, we "give deference to agency judgments as to how best to prepare an EIS," *Indian River Cnty.*, 945 F.3d at 533, so long as the EIS "contains sufficient discussion of the relevant

issues and opposing viewpoints" and "the agency's decision is fully-informed and well-considered," *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) (cleaned up).

III

We first consider whether BOEM adequately considered a "no action" alternative in the supplemental EIS.

A

In preparing an EIS, an agency must evaluate the "reasonable alternatives to a contemplated action." *Food & Water Watch v. FERC*, 28 F.4th 277, 282 (D.C. Cir. 2022) (cleaned up). These alternatives must include the possibility of taking no action. 40 C.F.R. § 1502.14(c).

In the supplemental EIS, BOEM assessed environmental impacts on the assumption that future lease sales would occur in the Gulf even if one such sale were cancelled. Given that assumption, the Bureau concluded the cancellation of one proposed lease sale "would not significantly change the environmental impacts" of development in the Shelf. J.A. 904.

This analysis was not arbitrary. Interior has a statutory obligation to make the Shelf available for development to meet national energy needs. 43 U.S.C. §§ 1332(3), 1334(a). Moreover, record evidence showed that the Gulf compares favorably to other parts of the Shelf in terms of development opportunities, infrastructure readiness, and industry interest. Thus, Interior's five-year plan proposed that all but one of its lease sales would take place in the Gulf. So BOEM reasonably concluded that the cancellation of a single lease sale would only postpone development in the region.

BOEM also reasonably concluded that such a cancellation would not materially change overall environmental impacts. It explained that these impacts turn on the aggregate amount of leasing in the long run. A typical lease runs for 50 years, and BOEM projected impacts over a 70-year timeframe. At this scale, any single sale would make "only a small … contribution" to overall activity in the Shelf. J.A. 550. And a one- or two-year delay in development would have little effect on overall environmental impacts.

B

The environmental groups argue that BOEM failed to consider a true "no action" alternative because it assumed future lease sales would occur. They also argue that it was arbitrary for BOEM to predict that the postponement of a lease sale would not significantly affect the environment. We reject both arguments.

1

The environmental groups argue that a true "no action" alternative would involve the cancellation of all future planned leases. We agree that BOEM needed to consider that alternative, but we think it did. In the programmatic EIS, BOEM considered the effect of allowing no new leasing in the Gulf and even in the entire Shelf. And in the supplemental EIS, it incorporated that analysis by reference.

BOEM permissibly divided its analysis across the EISs. Through tiering, an agency may first assess "broad environmental consequences" in a programmatic EIS and later supplement that analysis with "narrower EISs analyzing the incremental impacts" of specific actions. *W. Org. of Res. Councils*, 892 F.3d at 1237–38 (cleaned up). "The subsequent analysis need only summarize, and incorporate by reference,

the environmental issues discussed in the programmatic EIS." *Nevada*, 457 F.3d at 91.

The environmental groups object that such tiering would effectively "bind the agency to hold the lease sales as proposed in the five-year plan." Reply Br. at 4. But BOEM remained free to reconsider its plan. It simply had no obligation to do so where, as here, no new information had emerged since the earlier EIS. 40 C.F.R. § 1502.9(d)(1)(ii).

2

BOEM reasonably concluded that the cancellation of a single lease sale would have only limited environmental effects. The environmental groups assert that delaying development might have significant effects if key variables— such as supply, demand, or available drilling technology— change over time. The Bureau acknowledged that possibility, but it made "educated assumptions about an uncertain future" and then engaged in the "reasonable forecasting" that "NEPA analysis necessarily involves." *Sierra Club*, 867 F.3d at 1374 (cleaned up). Specifically, BOEM estimated future production levels based on historical data and current industry trends. It predicted impacts by analyzing a range of factors and estimating their "frequency, duration, and geographic extent." J.A. 947. And it explained the scale at which it was considering the impacts. Because BOEM disclosed its assumptions and gave reasonable analysis, its conclusion passes muster.

IV

We next consider whether BOEM acted arbitrarily by failing to consider potential changes to two environmental rules designed to reduce the risk of oil and gas spills.

9

A

The Bureau of Safety and Environmental Enforcement (BSEE), another component agency within Interior, makes and enforces rules to reduce risks from drilling. In 2016, it adopted two rules at issue here. The Production Safety Rule addressed certain systems and devices required to ensure safe production of oil and gas. *See* 81 Fed. Reg. 61,834 (Sept. 7, 2016). The Well Control Rule added new requirements for equipment used to safeguard against oil and gas blowouts. *See* 81 Fed. Reg. 25,888 (Apr. 29, 2016). After BOEM completed its supplemental EIS, BSEE revised these rules to eliminate "unnecessary regulatory burdens." *See* 83 Fed. Reg. 49,216 (Sept. 28, 2018); 84 Fed. Reg. 21,908 (May 15, 2019).

BOEM invoked the 2016 rules as it undertook its NEPA analysis. It concluded that they would help minimize the risk of future oil and gas spills. But BOEM did not consider whether the rules might be changed, or what impact any changes might have on environmental safety. BOEM acknowledged the possibility of changes only in response to comments to the supplemental EIS. Later, after proposed changes began to take shape, BOEM discussed them when it finalized Lease Sale 251. At that point, BOEM concluded that the changes would not increase environmental risks because they left key protections intact.

The environmental groups argue that BOEM should have discussed in its supplemental EIS the possibility that the 2016 rules would be changed.

B

We conclude that BOEM permissibly declined to consider the potential rule changes, which were too inchoate to require discussion in the supplemental EIS.

1

At the outset, we reject two threshold arguments raised by the intervenors. They contend that the environmental groups' criticism of the supplemental EIS amounts to a collateral attack on BSEE's decision to amend the rules, which is not cognizable under NEPA. *City of Olmsted Falls v. FAA*, 292 F.3d 261, 273 (D.C. Cir. 2002). But the groups do not challenge BSEE's regulatory amendments, only BOEM's failure to account for them. Because their theory "would have no effect on the validity" of BSEE action, they did not mount a collateral attack. *Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1160 (9th Cir. 2012).

The intervenors also argue that this dispute is unripe because the BSEE rules have no bite until after the leasing stage. But we have held that a NEPA challenge is ripe once leases have been issued, which is when Interior's decision "will result in irreversible and irretrievable commitments of resources to an action that will affect the environment." *Ctr. for Biological Diversity*, 563 F.3d at 480 (cleaned up). Because Interior has reached this point of inevitability, "it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the [rules] come into effect." *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974).

2

The district court said BOEM did not need to consider potential rule changes that, by definition, lacked the force of law. *Gulf Restoration Network*, 456 F. Supp. 3d at 100. We rest on a narrower rationale: An agency need not consider regulatory developments that are so inchoate as to be "not meaningfully possible" to analyze. *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (cleaned up).

In this case, BOEM finalized its supplemental EIS on December 5, 2017. *See* 82 Fed. Reg. 59,644, 59,645 (Dec. 15, 2017). Nothing in the record suggests that it had any specific information about the possible rule changes at that time. BSEE's earliest relevant action did not take place until December 6, when it completed its own draft environmental assessments. J.A. 1028–29. Although BSEE completed those assessments before BOEM published a notice of its supplemental EIS in the Federal Register, the relevant question is what BOEM knew "at the time the EIS was being prepared." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 609 F.3d 897, 898 (7th Cir. 2010). Nothing before us establishes that the draft assessments were available to BOEM before December 6—or, for that matter, at any point before they were published in connection with BSEE's proposed regulatory changes. *See* 82 Fed. Reg. 61,703, 61,717 (Dec. 29, 2017); 83 Fed. Reg. 22,128, 22,147 (May 11, 2018).

As of December 5, BOEM appears to have known only that rule changes might be forthcoming. Earlier in 2017, the President had ordered agencies to modify any regulations that burdened energy development unnecessarily, and the Secretary of the Interior had directed BSEE to review the Well Control Rule accordingly. 82 Fed. Reg. 16,093 (Mar. 31, 2017); J.A. 1079. But a general awareness that change might come is hardly the same as knowing its likelihood or contours. And NEPA does not require an agency to work through every "remote and speculative possibilit[y]." *NRDC, Inc. v. Morton*, 458 F.2d 827, 837–838 (D.C. Cir. 1972). So BOEM permissibly declined to consider in its supplemental EIS the potential for rule changes.

Because the environmental groups contest only what BOEM should have considered in its supplemental EIS, we need not address whether post-EIS developments, such as

publication of the proposed changes, constitute the kind of "significant new circumstances or information" that might warrant an additional EIS. 40 C.F.R. § 1502.9(d)(1)(ii). But we note that, before holding Lease Sale 251, BOEM explained its view that the proposed amendments would not undermine environmental safety because they left "critical safety provisions intact." J.A. 1073.

V

We last consider whether BOEM acted arbitrarily by failing to address a report about deficiencies in BSEE's enforcement of existing safety and environmental regulations.

A

BOEM repeatedly factored BSEE's work into its analysis. In the programmatic EIS, it "assume[d] that BSEE would implement requirements for safe operations and environmental protection," and it promised to "reconsider[] any related environmental impacts" if that assumption proved unfounded. J.A. 282. In the multisale EIS, it outlined BSEE's duties and regulations. And in response to comments to the supplemental EIS, it credited what it described as BSEE's "rigorous inspection program" and "rigorous enforcement programs." J.A. 1021–22.

But BOEM did not consider whether BSEE's work was in fact rigorous, despite some evidence that it was not. After each EIS, commenters asked BOEM to address a Government Accountability Office report that criticized BSEE. The report faulted BSEE for maintaining "outdated policies and procedures" and failing to develop "criteria to guide how it uses enforcement tools." J.A. 434, 438. It further found that this lack of criteria "causes BSEE to act inconsistently," creates uncertainty about BSEE's "oversight approach and

expectations," and risks "undermining [agency] effectiveness." J.A. 434, 438. After a commenter raised the report in response to the programmatic EIS, BOEM promised to address the asserted deficiencies at the leasing stage. J.A. 373. But it later reneged, telling commenters that the issues were outside the scope of the EISs at that stage. J.A. 736, 1023–24.

B

1

We agree with the environmental groups that BOEM's failure to address the report was arbitrary. To engage in reasoned decisionmaking, an agency must respond to "objections that on their face seem legitimate." *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (cleaned up). Here, BOEM itself had repeatedly acknowledged the importance of BSEE enforcement to its analysis of environmental risks. And the GAO report, while hardly conclusive on this point, raised seemingly legitimate concerns about enforcement effectiveness.

Of course, an agency may assume effective enforcement in the ordinary case. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (discussing presumption of regularity). But it may not reach a conclusion that "runs counter to the evidence." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). So, more is required when credible evidence seems to undercut the assumption. Here, BOEM sidestepped the GAO report and offered only unelaborated statements that BSEE's enforcement was "rigorous." In the circumstances here, that was not good enough.

Likewise, because BOEM promised to consider the GAO report at the leasing stage, it should have explained its later decision not to do so. BOEM was of course free to change its

views, but it should have acknowledged and explained the change. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Instead, BOEM merely brushed aside the report as beyond the scope of the supplemental EIS. This unexplained about-face was also arbitrary.

2

The district court discounted the GAO report because it did not suggest a complete lack of enforcement. *Gulf Restoration Network*, 456 F. Supp. 3d at 101. On that basis, the court sought to distinguish *Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581 (4th Cir. 2012), which held it arbitrary for the Corps to conclude that wetlands would be protected by a rule that was "entirely unenforced," *id.* at 588–89. But while *Friends of Back Bay* may be factually distinguishable, its reasoning applies here. The Fourth Circuit asked whether the agency had any "reasonable basis" to conclude that the rule "was being *adequately* enforced." *Id.* at 589 (emphasis added). As noted above, the agency here relied on an assumption of effective enforcement, but it declined to address evidence undercutting the assumption.

Interior further argues that BOEM did not need to address the report until after the leasing stage because BSEE enforcement does not begin until after leases are sold. But having invoked BSEE enforcement to argue that environmental concerns would be manageable, BOEM could not simultaneously "brush off comments" about lax enforcement "as beyond its purview." *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015). Moreover, we doubt that consideration of BSEE's effectiveness can wait so long. Only at the early OCSLA stages does the agency "look[] ahead and assimilate[] broad issues relevant to the program" overall. *Found. on Econ. Trends v. Heckler*, 756

F.2d 143, 159 (D.C. Cir. 1985) (cleaned up). After leases have issued, later EISs are "site-specific" and address "more particularized considerations." *Id.* (cleaned up). As with the issue of environmental mitigation more generally, BSEE's effectiveness is not merely site-specific, and so now was the time to address it.

Before this court, Interior argues that the GAO report does not raise significant concerns about BSEE enforcement. It makes at least a plausible argument on that score. But given everything we have discussed above, BOEM should have explained its position in an EIS. We cannot affirm based on a *post hoc* litigation rationalization pressed by agency counsel. *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943).

## VI

Because BOEM arbitrarily declined to consider the GAO report, we must reverse in part the grant of summary judgment and remand the case for further agency consideration of that issue. But we decline to vacate the supplemental EIS, the records of decision announcing Lease Sales 250 and 251, or the leases issued through those sales.

Although vacatur is the typical remedy for an APA violation, it is not inevitable. "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission*, 896 F.3d 520 (D.C. Cir. 2018), is instructive on the appropriateness of remand without vacatur in the NEPA context. There, we recognized the "seriousness" of the "deficiencies" in the EIS under review. *Id.* at 538. But we declined to vacate either the EIS or an associated mining

license because we had "not been given any reason to expect that the agency [would] be unable to correct those deficiencies" on remand, and we were concerned about the disruptive effects of vacating the license in the interim. *Id.* In addition, we concluded that the challenger would "not suffer harm—irreparable or otherwise" from leaving the license in effect at least for awhile longer. *See id.*

The same considerations are present here. Whatever the seriousness of BOEM's error, its attorneys make a colorable case that the GAO report ultimately should not change the bottom line. While we cannot affirm on that basis, we can say that the environmental groups have given us no reason to doubt that BOEM itself can make the same case on remand. Moreover, vacatur would be highly disruptive for the lessees. They have paid millions of dollars to obtain their leases and have acted for some four years in reliance on them—including by investing substantial additional sums and by executing contracts with third parties. Moreover, any redo of the lease sales "would be tainted by prior publication of [the] lessees' proprietary valuation of the leases" following the original sales. Intervenors' Br. at 33. Conversely, the environmental groups have identified no harm that flows from leaving the sales in place for now, when exploration and development cannot occur absent further regulatory approvals from Interior.

We also decline to grant an intermediate remedy between vacatur and remand without vacatur. The environmental groups propose that we at least enjoin activity under Lease Sales 250 and 251. We have occasionally ordered this kind of partial relief in NEPA cases. *See*, *e.g.*, *Pub. Emps. for Env't Responsibility v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016) (declining to vacate a lease or regulatory approvals but vacating an EIS and imposing conditions on the lessee's activity). But we see no reason to grant such relief here. The

deficiency in the supplemental EIS seems correctable, and even partial relief would be disruptive, as the lessees risk forfeiting their leases if they cannot timely meet certain obligations.

## VII

We reverse the summary judgment in part and remand the case to the district court with instructions to remand it to the agency for further consideration of the GAO report. In so doing, we decline to vacate any of the administrative orders under review. We affirm the summary judgment in all other respects.

*So ordered.*