# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 24, 2019      Decided December 20, 2019

No. 19-5012

INDIAN RIVER COUNTY, FLORIDA AND INDIAN RIVER COUNTY
EMERGENCY SERVICES DISTRICT,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00333)

*Philip E. Karmel* argued the cause and filed the briefs for appellants.

*Steven L. Brannock* and *Tracy S. Carlin* were on the brief for *amicus curiae* Indian River Neighborhood Association in support of appellants.

*Joan M. Pepin*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With her on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Eric Grant*, Deputy Assistant Attorney General, *Kevin W. McArdle*, Attorney, *Steven G. Bradbury*, General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant

General Counsel for Litigation and Enforcement, and *Charles E. Enloe*, Trial Attorney.

*Eugene E. Stearns* argued the cause for intervenor-appellee. With him on the brief were *David H. Coburn*, *Cynthia L. Taub*, and *Matthew Buttrick*.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In 2011, Intervenor AAF Holdings LLC ("AAF") announced plans to construct and operate express passenger railway service connecting Orlando and Miami, Florida. Phase I of the All Aboard Florida Intercity Passenger Rail Project (also "AAF Project" or "Project"), connecting Miami to West Palm Beach, has been completed. Phase II, which will extend service to Orlando, is presently under construction. In 2014, AAF applied for an allocation of tax-exempt qualified Private Activity Bond ("PAB") authority to partially finance Phase II of the Project. In December 2017, the Department of Transportation ("DOT") allocated $1.15 billion in tax-exempt PABs to be issued by the Florida Development Finance Corporation to finance Phase II of the Project. AAF, the sponsor of the Project, received the proceeds of the bond sales to fund the Project and is responsible for repaying them.

In February 2018, Indian River County, the Indian River County Emergency Services District (together "County" or "Appellant"), and other parties filed a complaint in the District Court claiming that DOT exceeded its authority under 26 U.S.C. § 142(m)(1)(A) when it allocated $1.15 billion in PABs

to fund Phase II of the AAF Project. The complaint further alleged that the allocation violated 26 U.S.C. § 147(f), which requires certain state or local governmental approvals before tax-exempt PABs may be issued. Finally, the complaint challenged the adequacy of the Environmental Impact Statement ("EIS") prepared by the Federal Railway Administration ("FRA") pursuant to the requirements of the National Environmental Policy Act ("NEPA"). *See* 42 U.S.C. § 4332. With respect to all of its claims, Indian River County raised causes of action under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2)(A) (an agency action may be set aside if found "to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *id.* § 706(2)(C) (an agency action may be set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). On December 24, 2018, the District Court rejected Appellant's claims and granted summary judgment to the federal defendants. *Indian River Cty. v. Dep't of Transp.*, 348 F. Supp. 3d 17 (D.D.C. 2018).

The District Court ruled that because the complaint arguably fell within the zone-of-interests protected or regulated by § 142, Indian River County was among the class of parties authorized by Congress to pursue a cause of action under the APA. However, the District Court found no merit in Indian River County's claims. The court ruled that the disputed Project constituted a "surface transportation project" under § 142(m)(1)(A), as required for DOT's allocation of PABs qualifying for tax-exempt status. The District Court also ruled that the use of the disputed PABs did not violate 26 U.S.C. § 147(f). And, finally, the District Court ruled that the FRA's preparation of the EIS as required by NEPA was neither arbitrary, nor capricious, nor an abuse of discretion, nor otherwise in violation of the law. On appeal, Indian River County challenges only the District Court's rulings with

respect to § 142 and NEPA. DOT and Intervenor AAF, in turn, contend that Appellant's claims should be dismissed because its interests are not within the zone-of-interests protected by 26 U.S.C. § 142(m). In the alternative, they seek affirmance of the District Court's judgments on the merits.

For the reasons explained below, we affirm the judgments of the District Court. We agree that Indian River County's interests are within the zone-of-interests protected by 26 U.S.C. § 142 and, therefore, the complaint raises claims that are cognizable under the APA. However, we hold that DOT permissibly and reasonably determined that the Project qualifies for tax-exempt PAB financing under 26 U.S.C. § 142(m). We also hold that the EIS for the Project adheres to the commands of NEPA.

## I. BACKGROUND

### A. Statutory Background

#### 1. Private Activity Bonds

Under 26 U.S.C. § 103(a) of the Internal Revenue Code ("Code"), interest on state or local bonds is generally not subject to federal taxation. 26 U.S.C. § 103(a). However, a PAB issued by state or local governments to finance private activities is not tax-exempt unless it is a "qualified bond." *Id.* § 103(b)(1). As the District Court explained:

> Congress has authorized interest earned on certain types of PABs to be exempted from federal taxation. *See* 26 U.S.C. §§ 103, 141. Because this exemption allows the bondholder to keep all the interest, bond issuers can sell the bond at a lower interest rate. . . .

5

Section 141 outlines certain types of PABs that can constitute "qualified bond[s]," including "exempt facility bond[s]." *Id*. § 141(e)(1)(A). Under § 142(a), a bond is an "exempt facility bond" if at least 95% of proceeds from its issue are used to finance one of fifteen enumerated categories of projects. *Id*. § 142(a). One such category is "qualified highway or surface freight transfer facilities." *Id*. § 142(a)(15). Section 142(m) defines "qualified highway or surface freight transfer facilities," *id*. § 142(m)(1), and authorizes the Secretary of Transportation, "in such manner as [she] determines appropriate," *id*. § 142(m)(2)(C), to allocate up to $15 billion of PAB authority to eligible projects, *id*. § 142(m)(2)(A). Put simply, Congress has enacted a mechanism through which the Secretary can allocate tax exemptions to bonds used to finance construction of, or improvements to, certain types of facilities. These exemptions lower the cost of selling the bonds, better enabling state and local governments to finance the projects.

The Secretary's allocation is necessary . . . for a bond to be tax-exempt because it finances a "qualified highway or surface freight transfer facilit[y]." *Id*. § 142(m)(2)(A).

*Indian River Cty.,* 348 F. Supp. 3d at 28 (alterations in original)

As noted, an "exempt facility bond" includes a bond whose proceeds from its issue are used to finance "qualified highway or surface freight transfer facilities." 26 U.S.C. § 142(a)(15). Section 142(m)(1)(A) defines "qualified highway or surface freight transfer facilities" as "any surface transportation project which receives Federal assistance under title 23, United States Code." Title 23, in turn, authorizes

federal funding for, *inter alia*, "the elimination of hazards of railway-highway crossings." 23 U.S.C. § 130(a).

## 2. National Environmental Policy Act

As we recently explained in *Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017), Congress enacted NEPA in part "to promote efforts which will prevent or eliminate damage to the environment and biosphere and . . . enrich the understanding of the ecological systems and natural resources important to the Nation." *Id*. at 15 (internal quotation marks omitted) (quoting 42 U.S.C. § 4321). To achieve these ends,

> NEPA requires all federal agencies to include a detailed environmental impact statement ("EIS") "in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment." *Id*. § 4332(2)(C). This process ensures that an agency will consider every significant aspect of the environmental impact of a proposed action and inform the public of its analysis. In other words, agencies must take a hard look at [the] environmental consequences of their actions, and provide for broad dissemination of relevant environmental information.
>
> . . . .
>
> Where NEPA analysis is required, its role is primarily information-forcing. As the Supreme Court has explained, "[t]here is a fundamental distinction . . . between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be

actually formulated and adopted, on the other." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes.

It is now well-established that NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions. It is equally clear that NEPA does *not* impose a duty on agencies to include in every EIS a detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action.

875 F.3d at 15-16 (alterations in original) (citations and quotation marks omitted).

In sum, because NEPA's requirements are "essentially procedural," the statute does "not mandate particular substantive environmental results." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 68 (D.C. Cir. 2011) (internal quotation marks and citations omitted). Instead, NEPA "focus[es] Government and public attention on the environmental effects of proposed agency action." *Id.* (alteration in original) (internal quotation marks omitted). Those requirements "simply . . . ensure that the agency has adequately considered and disclosed the environmental impact of its actions." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013) (internal quotation marks and citation omitted).

## B. Factual Background

The dispute in this case emanates from financial and environmental concerns relating to the construction and operation of an express passenger railway service connecting Miami, Fort Lauderdale, West Palm Beach, and Orlando, Florida. The rail service, known as the All Aboard Florida Intercity Passenger Rail Project, has been spearheaded by AAF. The new rail service will run along an existing rail corridor designed in the late 1800s by the Florida East Coat Railway ("FECR"). The FECR corridor accommodated both passenger and freight rail service until 1968, when passenger rail service was terminated. The AAF Project is designed to restore portions of the existing rail corridor between Miami and Cocoa and construct a new segment between Cocoa and Orlando. The ultimate goal is to establish speedy rail passenger service along a significant segment of the east coast of Florida.

AAF announced its plans for the Project in 2011. According to AAF, the high-speed passenger service will include 32 daily departures that will cover the 235-mile trip in about three hours. Phase I of the Project, connecting Miami to West Palm Beach, with a stop in Fort Lauderdale, was completed in January 2018. Phase II, connecting West Palm Beach to Orlando, is still under construction. When Phase II is completed, passenger trains will run north from West Palm Beach to Cocoa, turn west, and run inland along State Road 528 to Orlando International Airport.

9

The record indicates that, in both Phases of the Project, AAF is improving the existing rail corridor by:

> (i) replacing portions of the existing mainline tracks and reinstalling a second set of tracks where the historic second track was previously removed; (ii) adding a third track in certain locations within the corridor to allow for more efficient service; (iii) replacing or repairing existing bridges across waterways; (iv) installing Positive Train Control systems which will provide integrated command and control of passenger and freight train operations; and (v) upgrading railway-roadway crossing safety features per federal regulations and requirements, as well as specific requests from counties and municipalities along the Project route. JA1831-44.…
> In addition, AAF has been helping counties and municipalities convert existing crossings into "Quiet Zones," which eliminates the requirement for warning horns to be sounded as trains approach. JA2291.

Intervenor's Br. at 3.



*Id.* at 5.

In 2013, an AAF subsidiary applied to FRA for a $1.6 billion loan pursuant to the Railroad Rehabilitation and Improvement Financing program to help finance the Project. Because projects benefiting from such loans are subject to NEPA, FRA conducted an environmental review of the entire AAF Project. The agency prepared an Environmental Assessment and Section 4(f) Evaluation for Phase I, which resulted in a Finding of No Significant Impact. FRA also commenced preparing an EIS for Phase II, with the assistance

of the U.S. Coast Guard and U.S. Army Corps of Engineers. In 2015, AAF withdrew its loan application, so FRA did not issue a Record of Decision on its EIS. In 2017, however, after AAF resubmitted its loan application, FRA completed the NEPA review process.

The NEPA review lasted over two years and included an extensive period for public comment, including numerous public meetings in counties along the Project corridor. Over 15,400 written comments were received from interested parties, including Indian River County. FRA responded to comments in its Final EIS, which was published on August 5, 2015. The Final EIS is over 600 pages in length, includes an additional 70 appendices, and concludes that the existing FECR corridor was the only feasible alternative for the north-south segment of the Project. FRA also concluded that "[t]he Project would have an overall beneficial effect on public health, safety, and security in the rail corridor," J.A. 1658, as well as "beneficial cumulative impacts" on "transportation, air quality, and economic resources," *id.* at 1662. Finally, the EIS set forth significant mitigation measures relating to public safety, vehicular traffic, navigation, noise and vibration, water resources, biological resources, essential fish habitat, wetlands and other ecological systems, threatened and endangered species, and historic properties. *Id.* at 2503-21. After receiving additional public comments, FRA issued a Record of Decision on December 15, 2017. This included the agency's analyses regarding alternatives, environmental impacts, and mitigation, *id.* at 4357-4412, and a separate addendum in which it evaluated and responded to the comments on the Final EIS, *id.* at 4414-48.

In the end, the loan that had been sought by AAF was never made. As explained below, AAF obtained financing

through the sale of tax-exempt PABs and withdrew its loan application in February 2019.

The allocation of the PABs in support of the Project occurred as follows:

In 2014, AAF applied [to DOT] for an allocation of tax-exempt PABs to partially finance the project. To demonstrate that the Project is indeed a "surface transportation project which receives Federal assistance under title 23," 26 U.S.C. § 142(m)(1)(A), AAF submitted documentation showing that more than $9 million in Title 23-funded improvements had been made to 72 separate grade crossings (railway-highway intersections) since 2012 along the N-S corridor and the Miami to West Palm Beach corridor. DOT determined that the Project was eligible for PAB funding and provisionally allocated $1.75 billion in tax-exempt PABs to the project. In September 2016, however, AAF submitted a new request for a $600 million allocation for Phase I only, and it asked that the previous allocation be withdrawn. DOT granted both requests in November 2016. The $600 million in PABs for Phase I were subsequently issued by the Florida Development Finance Corporation and sold to private investors.

A year later, AAF submitted a new application for an allocation of PABs to finance Phase II. DOT allocated $1.15 billion for Phase II in December 2017. The Florida Development Finance Corporation's authority to issue those bonds was set to expire at the end of 2018, but it was extended to June 30, 2019. While this appeal has been pending, DOT granted AAF's request to modify the Phase II allocation to

allow for the issuance of an additional $950 million in PABs. All $2.1 billion in bonds have been issued. *See* https://www.transportation.gov/buildamerica/progra ms-services/pab.

DOT Br. at 6-7 (citations omitted).

### C. Procedural History

In 2015, Indian River County filed a lawsuit challenging DOT's December 2014 allocation of $1.75 billion in PABs. Martin County filed a similar action, in which it additionally claimed that the Project was not eligible to receive an allocation of PABs under 26 U.S.C. § 142(m). The District Court denied a motion to dismiss both Counties' environmental claims, but granted dismissal of Martin County's claim that DOT exceeded its authority under § 142. *See Indian River Cty. v. Rogoff*, 201 F. Supp. 3d 1, 20-21 (D.D.C. 2016). After AAF requested that the initial PAB allocation be withdrawn, the two cases pending in the District Court were dismissed as moot. *See Indian River Cty. v. Rogoff*, 254 F. Supp. 3d 15, 17-18, 22 (D.D.C. 2017).

The litigation in the present case was initiated in February 2018. Three claims were raised: First, the complaint alleged that DOT exceeded its authority under 26 U.S.C. § 142(m) when it allocated $1.15 billion in PABs to fund Phase II of the AAF Project. Second, the complaint asserted that the allocation violated 26 U.S.C. § 147(f), which requires certain state or local governmental approvals before tax-exempt PABs may be issued. Finally, the complaint challenged the adequacy of DOT's NEPA review of the Project prior to allocating the disputed PABs. AAF intervened to defend against the complaint. Martin County and Citizens Against Rail Expansion in Florida were originally named as co-plaintiffs, along with Indian River County. However, before this appeal was filed,

they reached a settlement with AAF and stipulated to the dismissal of their claims with prejudice.

In December 2018, the District Court granted summary judgment to the federal defendants and AAF. *See Indian River Cty. v. Dep't of Transp.*, 348 F. Supp. 3d 17 (D.D.C. 2018). As noted above, the District Court ruled that because the complaint arguably fell within the zone-of-interests protected or regulated by § 142, Indian River County was among the class of parties authorized by Congress to pursue a cause of action under the APA. The court also ruled that the disputed allocation of PABs did not violate § 142 or § 147(f). As to Appellant's claim under § 142, the District Court upheld DOT's determination that the Project is a "surface transportation project" that has received federal assistance under Title 23 of the U.S. Code, as required by 26 U.S.C. § 142(m)(1)(A). With respect to the § 147(f) claim, the District Court ruled that DOT lawfully allocated the disputed PABs after obtaining the State of Florida's approval, thus concluding that DOT was not obligated to seek the approval of each local governmental authority in areas through which Phase II will run.

Finally, the District Court found that FRA's environmental review of the Project satisfied NEPA's requirements. The District Court rejected Appellant's claims relating to pedestrian safety, noting the EIS's thorough study of every grade crossing along the entire corridor; the extensive safety improvements that AAF is mandated to make; and the record demonstrating that the EIS considered the safety of trespassers who cut across the tracks between formal crossings and addressed the safety problems posed by these situations. The District Court also rejected Appellant's claim that a complete mitigation plan, detailing the location and design of fencing along the railway, was required in the EIS. Finally, the District Court held that the EIS adequately examined noise impacts.

Indian River County now appeals the District Court's grant of summary judgment with respect to its claims under § 142 and NEPA, but it no longer presses its claim under § 147(f). DOT and AAF contend that the case should be dismissed because Indian River County's asserted interests fall outside the zone-of-interests protected by § 142. In the alternative, DOT and AAF seek affirmance of the District Court's judgments on the merits.

## II. ANALYSIS

### A. Standard of Review

"This court reviews the District Court's ruling on summary judgment *de novo*." *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1193 (D.C. Cir. 2018). In reviewing a summary judgment motion, courts are required to "'examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to' the non-moving party." *Id.* (quoting *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016)). We must then determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The District Court's conclusion that Appellant has a cause of action under the APA for its § 142(m) claim is also reviewable *de novo*, because it is a question of law. *Zuza v. Office of High Representative*, 857 F.3d 935, 938 (D.C. Cir. 2017).

When, as in this case, the appeal is from a final judgment issued by the District Court, we do not defer to the District Court's review of the agency action. *Novicki v. Cook*, 946 F.2d 938, 941 (D.C. Cir. 1991). Rather, "[w]e review the administrative action directly, according no particular

deference to the judgment of the District Court." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 718 (D.C. Cir. 2016) (internal quotation marks and citation omitted). The reason is that, under well-established law, "when an agency acts pursuant to congressionally-delegated authority and the action has the force of law, 'the agency itself is typically owed deference with respect to its fact-finding, *see NLRB v. Brown*, 380 U.S. 278, 292 (1965), its application of law to facts, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), and its interpretation of the governing statute or regulation, *see Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).'" EDWARDS & ELLIOTT, FEDERAL STANDARDS OF REVIEW 145 (3d ed. 2018) (quoting *Novicki*, 946 F.2d at 941).

Because neither NEPA nor 26 U.S.C. § 142 supplies a private right of action, judicial review under both statutes is governed by the APA. The APA requires that we "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In evaluating contested agency action, the court must "not . . . substitute its [own] judgment for that of the agency." *Id.*

In reviewing NEPA challenges, we must be "mindful that our role is not to 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor. Rather, it is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its

actions and that its decision is not arbitrary or capricious." *WildEarth Guardians,* 738 F.3d at 308 (citation and internal quotation marks omitted); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) (making it clear that the courts must give deference to agency judgments as to how best to prepare an EIS).

## B. Appellant's Interests Fall Within the "Zone of Interests" Protected by § 142

In *Lexmark International, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 129 (2014), the Supreme Court explained the "lenient approach" that the courts must follow in determining whether a party has stated a cause of action under the APA:

> First, we presume that a statutory cause of action extends only to plaintiffs whose interests "fall within the zone of interests protected by the law invoked." The modern "zone of interests" formulation originated in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970), as a limitation on the cause of action for judicial review conferred by the Administrative Procedure Act (APA). We have since made clear, however, that it applies to all statutorily created causes of action; that it is a "requirement of general application"; and that Congress is presumed to "legislate against the background of" the zone-of-interests limitation, "which applies unless it is expressly negated." *Bennett v. Spear*, 520 U.S. 154, 163 (1997). . . .

> We have said, in the APA context, that the test is not "'especially demanding,'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

567 U.S. 209, 225 (2012). In that context we have often "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff," and have said that the test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that'" Congress authorized that plaintiff to sue. *Id.* That lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review.

*Id.* at 129-30 (citations and brackets omitted).

DOT and Intervenor AAF argue that this case should be dismissed because Appellant's interests are not within the zone-of-interests of 26 U.S.C. § 142. In pressing this position, DOT argues that the District Court erred in concluding that "the interests at stake in § 142 . . . are illuminated by § 147(f), which requires State or local government approval for certain PABs to qualify for tax exemption." *Indian River Cty.*, 348 F. Supp. 3d at 29. In DOT's view, "the arguable existence of a cause of action under *Section 147(f)* does not give Plaintiffs a cause of action to sue for an alleged violation of *Section 142*." DOT Br. at 16. DOT's position is shortsighted, and it reflects a distorted view of the District Court's decision.

What the District Court said was this:

In applying the zone-of-interests test, courts do not look at the specific provision said to have been violated in complete isolation. At the same time,

courts must police the extent to which they look beyond the provision invoked to ensure that casting a wider net does not deprive the zone-of-interests test of virtually all meaning. Accordingly, a court must limit its analysis to the provision invoked for suit, as clarified by any provisions to which it bears an integral relationship. In this case, then, the Court must first determine whether § 147(f) bears an integral relationship with § 142, the provision upon which Indian River County sues.

The Court concludes that the two provisions do bear an integral relationship. They form adjacent requirements for PABs used to finance certain categories of facilities to qualify for tax-exempt status: § 142 enumerates the types of facilities, and § 147(f) ensures public approval and democratic accountability for their construction. Absent § 147(f) approval, PABs used to finance a § 142 facility cannot be tax-exempt; and PABs approved pursuant to § 147(f) are not tax-exempt unless they are used to finance a § 142 facility.

Most importantly, each requirement evinces a common purpose: ensuring that when the public fisc forgoes revenue through tax-exempt bonds, those bonds are used to benefit the public.

*Indian River Cty.,* 348 F. Supp. 3d at 29-30 (footnote, citations, quotation marks, and brackets omitted). This is a perfectly reasonable construction of the zone-of-interests test. The simple point made by the District Court is that "[b]y demonstrating that § 142 and § 147(f) bear an integral relationship, the County has illuminated § 142 in a way that suggests Congress's intent was indeed to allow State and local

governments to ensure public benefit would accrue from projects financed by tax-exempt bonds." *Id*. at 31. The District Court did not say, as DOT suggests, that the arguable existence of a cause of action under § 147(f) gives Appellant a cause of action to sue for an alleged violation of § 142.

In any event, we need not tarry further over the District Court's decision because we hold that Appellant is within the zone-of-interests of 26 U.S.C. § 142(m) for reasons analogous to those discussed in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 224-28. Just as the Court noted in that case, we note here that there is no dispute over the fact that Appellant's environmental and safety concerns are matters of the sort that DOT surely will have "in mind" when exercising its authority to allocate PABs pursuant to § 142. *Id*. at 227. This alone is enough to show that Appellant's asserted interests at least arguably fall within the zone-of-interests protected by § 142.

DOT has discretion under the statute to allocate PABs to qualified facilities. 26 U.S.C. § 142(m)(2)(C). And nothing in the statute precludes DOT from considering local government concerns and environmental issues when evaluating PAB allocations under § 142(m). Indeed, DOT instructs PAB applicants to "[i]ndicate the current status of milestones on [the estimated timeline provided], including all necessary permits and *environmental approvals*." Notice of Solicitation and Request for Comments, Applications for Authority for Tax-Exempt Financing of Highway Projects and Rail-Truck Transfer Facilities, 71 Fed. Reg. 642, 643 (Jan. 5, 2006) (emphasis added). DOT also instructs applicants to "[p]rovide a copy of a resolution adopted in accordance with state or local law authorizing the issuance of a specific issue of obligations [as required by section 147(f)]." *Id.* AAF's application

provided all of this required information. J.A. 4522, 4532-34, 4545.

DOT's position regarding the zone-of-interests inquiry is obviously wanting because it fails to take account of the fact that Appellant's cause of action arises under the APA, not under the Code. As noted above, the zone-of-interests test is not "especially demanding" with respect to matters arising under the APA, and "the benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 225 (citation omitted). Furthermore, the Supreme Court has "consistently held that for a plaintiff's interests to be arguably within the zone of interests to be protected by a statute, there does not have to be an indication of congressional purpose to benefit the would-be plaintiff." *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 492 (1998) (internal quotation marks and citation omitted). And a plaintiff certainly need not be expressly listed as a beneficiary of a statutory provision in order to be within its protected zone-of-interests. Finally, the Supreme Court has emphasized that the zone-of-interests test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 225 (citation omitted). That certainly is not this case.

In assessing whether a plaintiff's interests fall within the zone-of-interests protected by a statute, we must consider the "context and purpose" of the relevant statutory provisions and regulations at issue. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 226. "'[W]e do not look at the specific provision said to have been violated in complete isolation[,]' but rather in combination with other provisions to

which it bears an 'integral relationship.'" *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (second alteration in original) (citation omitted). In applying these principles, it is quite clear that Appellant – a local government entity whose citizens will be directly affected by the AAF Project – has compelling interests that fall within the zone-of-interests protected by the statute. The statutory context and purpose make this clear.

26 U.S.C. § 141(e)(1)(A) outlines certain types of PABs that can constitute "qualified bond[s]," including "exempt facility bond[s]." An "exempt facility bond" includes a bond whose proceeds from its issue are used to finance "qualified highway or surface freight transfer facilities." 26 U.S.C. § 142(a)(15). Section 142(m)(1)(A) then defines "qualified highway or surface freight transfer facilities" as "any surface transportation project which receives Federal assistance under title 23, United States Code." Title 23, in turn, authorizes federal funding for, *inter alia*, "the elimination of hazards of railway-highway crossings." 23 U.S.C. § 130(a). It cannot be doubted that Indian River County is seriously concerned about the effects of any surface transportation project that cuts through the County. Nor can it be doubted that Indian River County has a strong interest in limiting or removing any hazards posed by railway-highway crossings in the County. Therefore, on the record in this case, it is not difficult to conclude that DOT's allocation of PABs pursuant to § 142(m) implicates important interests of Indian River County. The County is a "reasonable—indeed, predictable—challenger[] of the Secretary's decisions" regarding PAB allocations in a case of this sort. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 227.

Given this context, we reject the suggestion made by DOT and Intervenor AAF that Indian River County's interests are

only "marginally related to" DOT allocations of tax-exempt qualified Private Activity Bonds pursuant to 26 U.S.C. § 142(m)(1)(A). We therefore affirm the judgment of the District Court that Indian River County's interests are within the zone-of-interests of 26 U.S.C. § 142.

## C. DOT Lawfully and Reasonably Allocated Private Activity Bonds to the AAF Project

The principal issue on the merits is whether DOT permissibly allocated PABs to the AAF Project. Appellant's argument on this point is straightforward:

> The AAF passenger rail project is eligible to be financed with private activity bonds only if it "receives Federal assistance under title 23." 26 U.S.C. § 142(m)(1)(A). The AAF project has not received such funding. DOT approved the use of PABs for the project on the theory that it will indirectly benefit from highway safety projects on railway-highway crossings that received federal funding under 23 U.S.C. § 130. These highway safety projects were made on the pre-existing freight corridor to be utilized by the AAF project. But a supposed benefit to the AAF project, even if proven, would not satisfy the statutory language that the AAF project itself receive federal assistance under title 23. Not only has the project not received such funding, it would not have been *eligible* for such funding because the only type of project eligible to receive funding under 23 U.S.C. § 130 is a project to improve the safety of railway-highway crossings. The AAF project is not a project to improve the safety of railway-highway crossings.

Appellant's Br. at 10. We find no merit in Appellant's argument.

Section 142(m)(1)(A) authorizes allocations of PABs for "any surface transportation project which receives Federal assistance under title 23, United States Code." DOT has followed a consistent interpretation of the statute that a project "receives assistance" for purposes of § 142(m) even if only a constituent portion was directly financed with Title 23 funds. Applying that interpretation here, railroad grade crossings are part of a railroad "project" on any ordinary understanding, and the record adequately supports the District Court's conclusion that crossing improvements were made in contemplation of the All Aboard Florida initiative. *See Indian River Cty.*, 348 F. Supp. 3d at 34-35.

After the Project was announced, AAF received $9 million in Title 23 funds that were used to upgrade railway-highway crossings on the Project corridor. About $2.2 million of those funds were used to upgrade 39 crossings in Phase II of the Project. The Title 23 funds used to improve the safety of the grade crossings clearly benefit the AAF Project and are important to "eliminat[ing] hazards of railway-highway crossings" as required by the statute. 23 U.S.C. § 130. Therefore, DOT permissibly and reasonably determined that the Project qualified for tax-exempt PABs under 26 U.S.C. § 142(m).

In opposition, AAF argues that DOT's interpretation of the statute rests on an "informal document" written in 2005 by the then-Acting Chief Counsel of the Federal Highway Administration and, therefore, it "does not warrant deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ("*Chevron*"), and at most is entitled to respect only to the extent it has the 'power to persuade.' *Skidmore v. Swift & Co.*, 323

U.S. 134, 140 (1944)." Appellant's Br. at 17; *see also* EDWARDS & ELLIOTT, FEDERAL STANDARDS OF REVIEW 211-16, 248-51 (3d ed. 2018) (discussing *Chevron* and *Skidmore*). DOT, in response, contends that "*Chevron* deference is appropriate in light of 'the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time.'" DOT Br. at 25 n.4 (quoting *Barnhart v. Walton*, 535 U.S. 212, 222 (2002)). We need not decide whether *Chevron* deference is due because it is clear on the record before us that DOT's position easily survives review under *Skidmore*.

When an agency's interpretation of a statute has been binding on agency staff for a number of years, and it is reasonable and consistent with the statutory framework, deference to the agency's position is due under *Skidmore*. *See, e.g.*, *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399-402 (2008). This is because an agency's views that are within its area of expertise are entitled to a level of deference commensurate with their power to persuade. *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001).

DOT's position has not only been consistent; it is also eminently reasonable. After the enactment of § 142(m), DOT sent a letter, dated October 7, 2005, to the Internal Revenue Service, explaining that "the most reasonable reading of [the statute] permits the proceeds of [PABs] authorized by this provision to be used on the *entire* transportation facility that is being financed and constructed even though only a portion of that facility receives Federal assistance under title 23." J.A. 4494. The letter further explained that Title 23 grantees typically build some segments of the facility with Title 23 funds and other segments with state or local funds, even if the

entire facility is eligible for Title 23 funding. *Id.* at 4493. The letter goes on to say that a narrow reading of the word "project" would "distort the longstanding way in which facilities are actually funded, create needless red tape, and artificially result in the extension of Federal requirements that have nothing to do with the bonding of transportation facilities." *Id.* at 4495. "This would result in doing exactly what the Congress indicated it did not intend to do. In summary, our view is that PAB proceeds may be used on any qualified facility that includes a project funded with Federal-aid highway funds made available under title 23." *Id.* DOT's long-standing position is based on persuasive considerations that are consistent with the statute. It is therefore due deference.

Appellant contends that DOT's position in this case should be rejected because the disputed PABs were approved for a surface transportation project that has not received federal assistance under Title 23. We find no merit in this claim. DOT has reasonably interpreted "project which receives Federal assistance under title 23" to mean a project which — in whole or part — benefits from assistance under Title 23. We have no reason to question this position because the statute does not require an applicant for PABs to be the direct recipient of Federal assistance under Title 23; rather, the "project" at issue must receive assistance under Title 23.

Appellant also insists that it is not enough that the AAF Project received some assistance under Title 23; rather, according to Appellant, in order to qualify for PABs under § 142(m)(1)(A), the entire proposed Project must be funded by Title 23. *See* Appellant's Br. at 20. However, there is nothing in the statute to support this interpretation. In this case, DOT reasonably construed § 142 to authorize an allocation of PABs to a project that has indisputably gained significant benefits

from Title 23-funded improvements to grade crossings throughout the rail line.

Finally, Appellant argues that DOT's approval of PABs for the AAF project is arbitrary and capricious because the federally funded highway safety improvement projects were not *intended* to benefit the AAF project. Assuming without deciding that such intent is required, the District Court correctly concluded that sufficient evidence of intent was present here.

The District Court found that:

> [T]he record indicates that a disproportionate amount of the Title 23 funding was disbursed only after the AAF project began. Over the ten-year period from 2005 through 2014, the railway received approximately $21 million dollars in Title 23 funding, approximately 43% of which came in the three years following the commencement of AAF's planning. Given that the AAF project received substantial attention in Florida, the Court is skeptical that the State's Department of Transportation disbursed (and increased) this Title 23 funding without the knowledge—if not purpose—of benefitting the project. In short, the record indicates that this is not an instance in which the AAF project was such an ancillary or unintended beneficiary of the funds as to prevent the Secretary from concluding that it had "receive[d] Federal assistance under title 23[.]" 26 U.S.C. § 142(m)(1)(A).

*Indian River Cty.,* 348 F. Supp. 3d at 35 (second and third alteration in original) (citation omitted). These findings and the District Court's conclusion are supported by the record.

A large portion of the disputed Title 23 funds were disbursed *after* the Project was announced and they provided federal assistance to the Project by improving grade crossings all along the corridor. The financial assistance provided has been substantial, and the benefits afforded to the Project are obvious. We therefore affirm the judgment of the District Court.

### D. The Environmental Impact Statement for the AAF Project Complied with the Requirements of NEPA

Finally, Appellant contends that the EIS prepared for the Project does not comply with the requirements of NEPA. Appellant argues that the EIS did not take a "hard look" at the effects of the Project on public safety; that it did not adequately disclose and mitigate safety risks to trespassers cutting across the tracks at locations other than at legal grade crossings; and that it did not sufficiently analyze the noise impacts caused by both the higher speeds of the freight trains on the improved tracks and the train horns at grade crossings. The record belies these claims.

The Supreme Court has emphasized that "inherent in NEPA and its implementing regulations is a 'rule of reason.'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (citation omitted). This standard "ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Id.* "NEPA does *not* impose a duty on agencies to include in every EIS a detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action." *Mayo*, 875 F.3d at 16 (internal quotation marks and citation omitted). And once an agency has taken a "hard look" at "every significant aspect of

the environmental impact" of a proposed major federal action, it is not required to repeat its analysis simply because the agency makes subsequent discretionary choices in implementing the program. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). In sum, the Supreme Court has made it clear that we must give deference to agency judgments as to how best to prepare an EIS. *See Robertson*, 490 U.S. 332.

As the District Court's decision shows, the environmental review process conducted by FRA was thorough and it complied fully with the commands of NEPA. The District Court aptly noted that "[a]gency action is rarely perfect. But NEPA does not demand perfection. Instead, it requires that an agency take a 'hard look' at the reasonably foreseeable impacts of a proposed major federal action. The extensive Final EIS, appendices, common responses, and Record of Decision together demonstrate that FRA met that requirement here." *Indian River Cty.*, 348 F. Supp. 3d at 61-62. We agree.

As noted above, FRA prepared an EIS, covering more than 600 pages, examining the environmental impacts of the Project. J.A. 1635-2574. This process also included multiple public meetings and opportunities for public comment. *Id.* at 2559-74. In September 2014, FRA released a draft EIS and received more than 15,400 comments from a wide range of stakeholders. The public commentary was then considered by FRA when it prepared the Final EIS. *Id.* at 2569. In early August 2015, the Final EIS was released. *Id.* at 1667.

The EIS examines the Project's impacts on land use, transportation, navigation, air quality, noise and vibration, farmland soils, hazardous material disposal, coastal zone

management, climate change, water resources, wild and scenic rivers, wetlands, floodplains, wildlife habitat, threatened and endangered species, social and economic effects (including impacts on low-income communities), public health and safety, parks, and historic properties, as well as the Project's cumulative impacts when combined with other past, present, or reasonably foreseeable future actions. *See id.* at 1635-2574. The EIS also sets forth a host of mitigation measures to ameliorate those negative impacts. *Id.*

The EIS additionally includes a thorough discussion of pedestrian safety, at both formal and informal crossings. And it examines and discusses mitigation of risks to pedestrians, including those using informal crossings. With respect to formal crossings, the EIS relies on a survey of every grade crossing on the rail corridor. This survey was conducted by FRA's Office of Safety, Highway Rail Crossing and Trespasser Program Division, and it includes an accompanying analysis summarized in engineering reports which are included in the EIS as Appendix 3.3.5-B. *Id.* at 2604-19.

The EIS further acknowledges that informal crossings do occur and that this form of trespassing was "an epidemic along this corridor." *Id.* at 2607 (Appendix 3.3.5-B); *see also id.* at 1762. The EIS recognizes that these informal crossings are illegal and unsafe, *id.* at 1762, and that the arrival of AAF's passenger rail service could increase the frequency of accidents involving trains and pedestrians, *id.* at 2397, 2400.

To mitigate these risks, the EIS describes a two-pronged approach: (1) AAF must discourage the use of informal crossings by installing fencing, and (2) AAF must encourage the use of formal crossings by adding sidewalks. *Id.* at 1763-64. This mitigation approach also includes a public information

campaign, which will be conducted in coordination with the rail-safety organization, Operation Lifesaver. *Id.*

Moreover, the EIS notes that the rail corridor is already fenced in at certain locations, *id.* at 2199, and that AAF will conduct field surveys along the right-of-way to determine where additional fencing and other preventative measures are needed to prevent trespassing, *id.* at 2400. The EIS provides that the "corridor will be fenced where an FRA hazard analysis review determines that fencing is required for safety; this will be in populated areas where restricting access to the rail corridor is necessary for safety." *Id.* at 1900. "Fencing on the N-S Corridor would be upgraded based on existing public access locations and the potential for conflicts with the increased train frequency." *Id.* at 2400.

In addition, the EIS takes a "hard look" at noise impacts from the Project. It finds that, if left unmitigated, these noises (principally from the warning horns that the trains, both freight and passenger, are required to sound at public highway-rail grade crossings) could cause adverse impacts. To mitigate these impacts, AAF committed to installing pole-mounted horns at 117 intersections in the Phase II corridor, *id.* at 2291, including 23 in Indian River County, *id.* at 2671. To further reduce horn noise, AAF is cooperating with local governments that wish to establish "quiet zones" that allow both passenger and freight trains to pass through grade crossings without sounding horns. *Id.* at 2291.

It is unnecessary for us to detail other parts of the EIS or the environmental review process. The District Court's opinion, which offers an impressively thorough and thoughtful examination of the record, and which we endorse, is more than sufficient. *Indian River Cty.*, 348 F. Supp. 3d at 42-62. The

bottom line is that the Final EIS for the AAF Project clearly complies with the requirements of NEPA.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the District Court.

*So ordered*.